24-2125, I.S. v. Binghamton City School District. And I understand we have counsel for the appellants, Katrina Feldkamp. Whenever you're ready, Attorney Feldkamp, I understand you would like to reserve three minutes for rebuttal. Is that right? That's correct. Good. You may proceed. Good morning, Your Honors. May it please the Court. The lower court's grant of summary judgment must be reversed. A jury could reasonably conclude that A.S., I.M., I.S., and J.B. were 12-year-old girls acting as 12-year-olds often do, and that this is ultimately a story of school administrators rushing to judgment and subjecting those young girls to intrusive searches. Specifically, a reasonable juror could conclude for two reasons that Apelli's searches of the 12-year-old girls were unconstitutional. First, a reasonable juror could conclude that Apelli's lacked reasonable suspicion to initiate their searches of the 12-year-old girls based on the girls' individual conduct. When we look at the facts, particularly material disputes disregarded by the lower court, we see that the girls walked the halls for seven minutes and, when found by school officials, exhibited behavior that was silly but was otherwise age-appropriate and typical of their prior conduct. Well, when you say it was silly, I guess you could characterize as that, but wasn't it also not what they were supposed to be doing at the time? Certainly, Your Honor. Well, that's a little different than just silly. And while it is concerning that the girls were not in their assigned classroom at the moment, TLO and its progeny hold that an inchoate and unparticularized suspicion is not sufficient to provide reasonable suspicion. We must have suspicion of a particular infraction. The fact that the girls were wandering the halls for seven minutes does not provide the particularized suspicion that the girls ingested purple juice, as Apelli's alleged does. Does it matter that the school saw them at a time when the school was aware of a problem with some improper substance being consumed? Under the facts we have here, Your Honor, it does not. It does not? Apelli's cannot point to any particularized evidence that connects the 12-year-old girls to the problem of purple juice that they allege. But you do agree that the purple juice factors into our analysis, right? We- I mean, it doesn't matter. Even if these particular defendants were not subjectively motivated by looking for evidence of the purple juice, that's not the test, right? It's an objective analysis, right, of what facts were known and whether those facts would have given rise to reasonable suspicion to reasonable school officials, right? That's correct. But I think there are a couple of things to consider on that point, Your Honor. First, we must look at the credibility concerns that this issue raises for Apelli's. Apelli's- Credibility of who? Of the officials here, Your Honor. Why would that matter? We're in the Fourth Amendment. Wren tells us that we don't look at subjective motivations. So they could be lying and it wouldn't matter. That's correct. But when we look at this- So why are we looking at credibility? If lying doesn't matter, why would we look at credibility? We must look to the statement of the search that the Apelli's agreed to before they conducted the search. The what? The statement that Apelli's made when they agreed to conduct the search. So Apelli's agreed that the girls would be searched broadly for contraband, not purple juice in its components, not evidence of drug use. Hang on a second. Simply contraband. Let's go back to traffic stops, right? Police pulled somebody over for failing to signal a left-hand turn. But in their heart, they really wanted to look for a gun. We don't care, right? The Fourth Amendment, as interpreted by the Supreme Court, says we don't ask what was in their heart. We ask, did they signal to make a left turn? And if there was a traffic infraction, it doesn't matter what they were actually thinking. So I guess I'm trying to get to why are you now going to embark on a discussion of whether they talked about purple juice at the time they did the search, whether- it doesn't matter. It is certainly an objective inquiry. Your Honor is correct on that point. But there are two reasons that it matters here. Apelli Eggleston was not present to observe the behavior that Apelli, Simons, and Riley observed that may have, though appellants maintained did not, lead to a reasonable suspicion of purple juice. She simply received a directive and an agreement with the other Apelli's to search broadly for contraband. And she carried out that directive. So if the principal comes in and has, let's say, all sorts of good, reasonable suspicion. Let's say she saw them carrying in both fists a bottle of Robitussin. But she doesn't tell the nurse. And she goes in and says to the nurse, look, you've got to take their vital signs and look for them. You're saying that Eggleston could be held responsible for a Fourth Amendment violation for obeying the principal because the information about the Robitussin wasn't passed along to her? We must examine and- That's a yes or no question. Given if Eggleston, under that scenario, carried out the facts and the search that she carried out here, absolutely, Your Honor. Absolutely what? Absolutely she could be held liable. We must look at whether the- Hang on. I just want to probe that. If the principal had probable cause, let's throw away reasonable suspicion. She sees them carrying the Robitussin in their hands. But they put them down and she brings them to the nurse. And then the principal says, you've got to search these kids for, I don't know, purple juice, all this, everything she did. You're saying that Eggleston could still be held responsible under the Fourth Amendment for lacking reasonable suspicion? No, Your Honor. For the scope of the subsequent searches. I may not have been clear about my question. Yes. Okay, if that's true and there's sort of a shared sort of knowledge that's imputed from one to the other, the person who's taking direction, then I don't understand your point that Eggleston didn't witness the behavior out in the hallway, how that's problematic. Tell me that link, why that's a problem. Appelli Eggleston received a broad directive and she carried it out in a broad way, Your Honor. Appelli Riley also carried out this agreement in a broad way. We are required to look at whether the measures taken in the search were reasonably related to the objectives. And there must be under TLO a nexus between the item searched and the infraction under investigation. Here, the item search was not defined in a way that allows us to even apply that inquiry in a coherent way. And Minnesota v. Dickin cautions against the danger that the officials would do exactly what they did here. Enlarge a specific authorization into the equivalent of a general warrant to rummage at will. So let's break down the search, because I think there are different components of what you allege to be the search. Am I correct in understanding your brief to allege that the nurse taking the vital signs was part of a search? That's correct, Your Honor. So the blood pressure cuff was a search, looking at their pupils for dilation was a search, having them stand on one foot and touch their nose, the sobriety test, I'll call it, that was a search? Correct. Given the dual medical and investigative purpose, that was a search. So tell me how that would not have been a proper scope of a search, as you call it, assuming it's a search, in light of if they were reasonably suspecting that they had ingested some sort of a substance. If they had a reasonable suspicion that the girls had ingested a substance, that would be proper. However, because they have no particularized evidence to connect the 12-year-old girls to that purple juice problem, there was no reasonable suspicion at inception. And even if they had, the medical searches by Apelli's own admission returned completely normal results and no evidence of intoxication. Under the Supreme Court's precedent in Brent v. Ashley, school officials must look at each step of the escalating search, whether they continue to have reasonable suspicion. Now that's a different argument, that, right? That's saying even if the medical search was fine, their expansion, let's call it the expansion of the search, which I take it is basically empty your pockets and shake out your shoes was a problem, right? It was much more intrusive for three of the other girls, but yes, all of the girls were directed to empty their pockets and shake out their shoes. Well, how was it? IM, I know, was subjected to what sounds like, I think we would all call a strip search, although she dropped the charge against Edelson, so that's another issue about whether there's evidence of the school administrators being involved. But who else was involved? Just remind me of the facts. Who was involved in something that arguably was a strip search? I mean, A.S., I know there was an order to do it, but she didn't comply. The facts when viewed in the light most favorable to the plaintiffs, Your Honor, show that in fact A.S. was directed to unzip her sweatshirt. Yeah, I know, but I thought she didn't comply. She did comply with that directive, Your Honor. I thought she unzipped it and zipped it right back. She unzipped it, revealing her bra because she had nothing under her sweatshirt. So you're saying that the zip, even if it was only for a second, that was revealing of personal intimate areas. Yes, because she was forced to expose those sensitive areas, that is considered a highly intrusive search. I.S. was also subject to a pat-down that included her arms, waist, thighs, and legs. And under TLO, any search of a student that involves their person or touching their body is a severe invasion of privacy. So we have to consider those things as we looked at the intrusiveness of the searches. And because reasonable suspicion was vitiated by the medical searches, it was not reasonable for the appellees to continue their searches after that point. Was it undisputed that the substance present in the school, that consumption of that substance could lead to rather bizarre and untoward behavior? The facts of purple juice symptoms are not disputed in the record, Your Honor. Appellees themselves sent out a community notice describing the symptoms of purple juice to include drowsiness, slow or absurd speech, and memory loss. Instead, what we have here, and why appellants maintained it was not reasonable for school officials to suspect the girls of purple juice consumption, is hyper and giddy behavior, which is not consistent with a depressant, and evidence in the record, including from appellees, that three of the girls engaged appropriately and coherently when school officials asked them questions. It is simply not reasonable for a school official to suspect that that indicates consumption of a depressant that contributes to slow and slurred speech or drowsiness. I see I am over time. I have one more question before you sit down. This won't count against your three minutes, though. With respect to, and I apologize if I'm going to get the initials wrong. I think it's I am, who I think probably had the most extensive search of her body. Remind me that she has dropped her claims against Eggleston under the Fourth Amendment, right? That's correct, and against Eggleston only. And that was to make it all final so that we would have appellate jurisdiction, I assume. That's correct. And I take it there's a dispute between the parties. The other side says, well, we should therefore infer that you've abandoned all claims against the principal and vice principal. You say no. Assuming that you have not abandoned or waived your claims against other school officials, tell me, though, what evidence was in the record that would render them liable for, let me call it a strip search. It is my understanding of the record, but again, I could be misremembering that, that neither of them was present in the room when the strip search happened. Is that correct? That is correct, but there are two reasons why Apelli, Simons, and Riley are still liable for that search. First, under this court's precedent in Terebisi, an official may be liable for a search if they help plan that search and if the search as planned and carried out implicates constitutional concerns. Right, so yeah, that's where it was going is if there's some evidence that they directed or told the nurse to do this. So that's what I'm asking. What's your evidence? A deposition or an affidavit, whatever, hopefully with a page reference to the appendix that shows the principal, the vice principal, told her to do a strip search as opposed to just look at the kids because there was also a medical exam. Of course. So what's to show that these two people authorized or planned the more intrusive search of IM? On pages 207 to 208 of Apelli-Riley's deposition, she testifies that the Apelli's agreed that the minors would be searched for in their pockets or in any place that would have led to where they may have had contraband. Apelli-Eggleston then carried out that broad directive. Moreover, Apelli-Riley was present in the room and carried out an additional search of IM's property beyond the point where suspicion was vitiated by the medical search. For that reason, Apelli's, Simons, and Riley are liable for the searches. Thank you. Now you've reserved three minutes for rebuttal. Why don't we hear from Attorney O'Connor for the appellees? May it please the court. My name is Shannon O'Connor. I represent Principal Tim Simons, Assistant Principal Michelle Riley, and Nurse Eggleston. Your Honors, we respectfully ask this court to affirm the well-reasoned and thoughtful decision by Judge Sotheby in the lower court based on the undisputed facts at the time, establishing reasonable suspicion at the moment of inception that it was justified at that time, and then that the scope was minimally intrusive based on the nature of the claims and the sex and what was known to the teachers at that time. I think it's important to recall here what was going on in the school because the Fourth Amendment is clearly a fact-sensitive inquiry. In this case in particular, the district court properly applied TLO, the two-part standard, to the undisputed facts so that he could then conclude as a matter of law that there was no Fourth Amendment violation based on reasonable suspicion. Let's talk about what occurred on that day in particular and what we know. Michelle Riley knew these girls, and this is also in the record, knew these girls because she was the assistant principal for them both in their sixth grade year and their seventh grade year. So she knew their objective, normal, typical behavior in the school and when they interacted with adults, teachers, staff, other administrators. So we have a basis of knowledge of understanding that well in advance of just this day. Then what we also know is that there was a fight between JB and DAW in the first marking period in December of 2018. The fight was so significant that DAW- Can we fast forward because we don't have the, how is the fight relevant to whether they get the search for purple juice or something? Fair, Your Honor. I'm not seeing, I've never understood that connection. Okay, I'm sorry and thank you for the opportunity to clarify that. That fight just led to Michelle Riley's heightened awareness in the court when they came out that other door. Okay, fine. To search for them to begin with. Now we've got to justify the search. I don't agree. We can hear every fact in the record and go back to when the dinosaurs roamed. Sure. Fair enough. It was just that the investigators just weren't looking for them. We know the background. Okay, just to look for them in the outset. So knowing that background and then when the girls didn't go to their fourth, the fourth floor, where their coloring activity was supposed to be, take that into consideration that they actually did an investigative, the school officials were looking for them at that time. All of this plays to the basis of knowledge. Right, but it just goes to, and maybe I'm asking, doing the same type of thing as Judge Cianardini, if the idea is what you're talking about now, the prior knowledge, that there was this altercation, all of that to me, it's relevant to the idea of if they were seeking them out, reasonable suspicion of a fight or something of that. To get to the question of reasonable suspicion of drug use, all of those factors that you're mentioning, perhaps they're relevant to that in a way, but if you could get to the reasonable suspicion of drug use, what supports that? Thank you, Your Honor, for the question. When the girls were found, okay, Tim Simons found the girls on the opposite side of the building, on the second floor where no students were supposed to be at that time. When he observed them, IS had fallen on the floor, her gait was atypical, and it's not usual for a 12-year-old girl to lie in the middle of the floor with her legs standing straight up in the air. Well, that's, I mean, that characterization as if she's just lying on the floor with her legs in the air doing yoga. Sure. She falls and appears. Two young girls are interacting. She falls on the floor, and then she gets up. I mean, that's- She does get up, Your Honor. She does. But as the girls are walking towards Mr. Simons, their gait is atypical. They are laughing. A couple of the girls are even, like, there's no one in the hallway, and their bodies, they're walking across the hall and, like, leaning up against the wall. And by the time they get to Mr. Simons, we have AS that tried to go up the stairs. Michelle Riley is coming over. They sat and observed their behavior for four minutes. It's not as though they made the determination to take these kids immediately to the nurse's office. Can I just ask you something? The district judge in the decision spends a lot of time describing and characterizing his view of what the video shows, and I'm just wondering what your view is as to the significance of the video, because both sides have given their explanations of what the video shows. There is no audio to the video. I'm just-I guess I'm questioning, like I said, what do you think the significance of- does the video conclusively establish either the oddness of behavior that you're alleging or anything of that sort? Because, as I said, the district judge describes it, and in the description of it, to me, there are characterizations that-certainly a reasonable characterization, but certainly there could be a reasonable characterization that's different than that. I think the importance of the video, including the lower court's decision on this, is that there's an objective quality that corroborates the testimony of the school officials. So give me an example of something that is in the video that is objective corroboration of the school officials' view of what's going on. JB is leaning up against the wall in the video, holding her knees, bouncing up and down, and then there's a period of time when they're talking to her. She's rolling her head back and forth, and you can see the school officials turn at that time to sort of look like what is going on as we're trying to talk to them and gain information. I think really the key point of the video, regardless of the multiple interpretations, is that two officials with the school, with an understanding of their typical behavior, sat there and talked to them to try to figure out what's going on and to understand their behavior for approximately four minutes before making a determination to go. Without knowing what is being said. I mean, obviously the parties have given their, some evidence of what they're saying is being said. The video does not show that, though. There's no audio. There is no audio, but you can at least infer from the video that they're making some sort of inquiry and trying to understand where the girls were, why they were missing for as long as they were. There is definitely dialogue. Yeah, but that just goes to sort of their good faith, but not as to whether they had reasonable suspicion to believe the girls were on drugs, right? That's different. I don't understand how the school officials' reactions are relevant to whether what they then decided to do was just to honor the Fourth Amendment. Fair point, Your Honor, and I would say this. The girls' testimony also admit that they were laughing during that interaction and laughing in a way that was atypical. Did they admit that it was atypical? Did the girls admit that it was atypical? No, I'm sorry. I misspoke. I should say that the girls... I just want to be really clear, because I think everybody agrees they're laughing. It's obvious they're laughing. They're goofing, and it seems to me the question is a factual one, whether it was atypical or not. Well, I think the part that's... Is that not? I don't think it is atypical, given... I'm sorry. Let me rephrase that, Your Honor. Okay. So, based on the totality of everything that they knew that was going on and the fact that they were concerned about spiked drinks, they were looking for behavior that was consistent with those spiked drinks, right? And in J.B.'s testimony, she does admit that they were aware of the spiked drinks, even in the school district after they transferred to West afterwards. This was a problem that the schools were confronted with. It's really about the health and safety. Can I ask you this? So, to go... Yes, Your Honor. I think the courts have suggested that we sort of have this sliding scale of reasonable suspicion, that you need to have sort of a... Suspicion is reasonable at a very low level if you're going to do a search that's very minimally intrusive. But then the Supreme Court has suggested, and we've suggested, that you have a heightened level of what is considered reasonable if you're going to do, say, a strip search. So, assume for the sake of argument that we were to agree with you that there was enough suspicion that something might be amiss to send these girls into the nurse to take their vital signs, right? Pupil dilation, sobriety, chest, that sort of thing. What, then, do you say to your opponent's argument that there was not enough to justify, then, more intrusive searches that followed? And I guess you can break them down. I suppose you could say, well, maybe emptying your pockets or emptying their shoes is one thing, but maybe a pat-down is a different thing, or they argue about AS having to at least, even if it was just for a second, zipping and unzipping. What do you say to that, the escalating nature of the search? You would agree, well, let me ask you first. Do you agree that there was an escalating search, that it was more intrusive to make them empty their pockets and be patted down than to just have the nurse look at them? Do you agree with that? Partially. Even if it's not zero to 60? Yeah. I agree that they extended the search, and then they started to search on their person and their property and their body, so I do agree that that was an escalation of the search. So what happens when the nurse looks at them, and I understand the evidence is undisputed, that the nurse says, well, I don't see anything wrong with them? I think that to then create a scenario, Your Honor, in a school environment that would require them to not go and look to see if there was some evidence to understand the girl's behavior. Part of the nurse's, right, we rule out the health reason because we have the dual purpose. Now they go one more step, and there's nothing to say that the reasonable suspicion that they had about their behavior and what was going on had been dissipated. We have two officials. We have Ms. Gonzalez. But I thought it was their physical behavior that was worrisome, that was leading the school officials to think maybe they're on drugs. Yes, and I was going to suggest to you. And I guess if the nurse looks at them and says, no, actually there's nothing about their behavior that's problematic, why would they then look for things to explain their behavior if the nurse says, no, there is no problem with the behavior to begin with? No, the nurse said that there was nothing from her objective test that could say that they ingested anything and that they were in normal range. What did not dissipate was their unusual and atypical behavior observed by people in the nurse's office. So to create a rule that says a school official, if you flip it, think about it in the alternative. They searched their shoes, their pockets, or their persons first and find nothing on their person to indicate that they had ingested some harmful substance, which we all agree is dangerous in a school setting. If they did that, to accept your premise in the rule that they're seeking would mean that school officials may not be able to then go and do a vital test or something else. But that's always true in the Fourth Amendment context. That if someone does a search that then leads to the dissipation of probable cause or reasonable suspicion, then no, you can't escalate. I would agree with that, but there's nothing in this record to say other than their own innocent explanations. No, no, no, the nurse. It's the nurse's evaluation is my question. I understand that. They're arguing that even if there was justification for the medical check, once the nurse said clean bill of health, doesn't that dissipate the concern that they might have ingested some sort of noxious substance? I would disagree with that premise, Your Honor, for the simple fact that in this case and in cases cited in our brief, we noted that reasonable suspicion is not dissipated when certain facts are present. And we believe that those facts are present here and they were undisputed. I just want to point to two important, because I know my time is up, is that even though Ms. Gonzalez, a teacher, came in to the nurse's office and explained that the behavior was unruly and out of character, and she had two students in her class, then SRO Williams, who also observed them in the nurse's office, noted that their behavior and their conduct was not their normal presentation. The officials here acted in accordance with their concern and well-being in the confines of the Fourth Amendment to make sure that they were safe and did a very minimally invasive search. My time is up. I thank you and thank you for reading the brief. Could you just clarify one aspect of the sequence? Sure, Your Honor. The nurse satisfied herself the vital signs were within normal ranges. That happened. Was that before or after the unzipping of the outer garment? For AS? Yes. Okay. So now AS goes into the nurse's room first. She was the first student to be examined. She was in there with Nurse Eggleston. And during the time in which Nurse Eggleston was in there by herself with AS and they were getting ready to do the examination, that is when the unzipping occurred. No one else was in that room. So the answer is it happened before the ascertainment of normal ranges. I believe it was during the context of whether or not the blood pressure cup would fit on her arm for an objective reason. So it was in the context of ______. Well, it either was before or after she ascertained that the readings were normal. It was in the process. It can't be before, Your Honor. I'm sorry because she checked their blood pressure first and their pupils, and then she was doing their blood pressure cup. Had she ascertained all the vital signs before the unzipping? No, sir. So the answer is no. No, sir. One more question. Yes, sir. If there had been ingested a substance that can lead to erratic behavior and that led to some untoward conduct by these students, might the school be liable for that conduct? Of course. So you're caught either way? Yes, sir, without question. Thank you, Your Honor. All right. Thank you very much. Why don't we hear from counsel for the appellant, Attorney Feldkamp. You've reserved three minutes for rebuttal. Thank you, Your Honor. I'd like to note briefly that it is Could you be able to just follow up on Judge Newman's question about the sequence? I just want to make sure. I saw nodding and shaking of hands. I don't know. Maybe you agree or disagree with the sequence of the zipping for AS. That's right, Your Honor. It is a disputed fact, and AS's testimony is that that unzipping occurred after the medical searches. To the extent that fact is disputed, it must be reserved for a jury because it's critical to the Fourth Amendment inquiry. Do you have a page citation to the appendix for that? I can follow up with that, Your Honor. I don't have that at the moment. You're saying the unzipping occurred before all the vital signs were checked? After the vital signs were checked, Your Honor. After all of them? That's correct. And what's the basis in the record for that? I can confirm, but AS's deposition. What? AS, the deposition of AS. What did she say that confirms that? The sequence of events was that the vital check was conducted, and then she was directed to unzip her sweater. She did so to a halfway point between her bra and her torso. She then zipped it back up because she was uncomfortable. And then Nurse Eggleston directed her to remove her bottoms, and she refused to do so. And then what was the last thing? Nurse Eggleston directed AS to remove her bottoms, and AS did not comply because she was uncomfortable. And you're saying at that point all the vital signs had been checked? The vital signs had been checked prior to this, yes, Your Honor. According to the student's testimony? That's correct, Your Honor. Now, appellees rely on both characterizations of the video and testimony and inferences about what happened in the video that we cannot understand from audio. So let's actually look at the facts in the record to understand that. First, the testimony about what the girls were saying and how they were saying it, which the district court specifically chose not to regard, despite the fact that JOC requires looking outside of a video where a video does not resolve factual disputes. We know from the testimony in the record of appellees themselves that IM demonstrated appropriate behavior, considering she was engaging with school officials. JB answered- I don't understand what you mean, we know that it's appropriate. That sounds like a judgment, a value judgment. It's a value judgment- Did she walk up and say, hi, I'm acting appropriately? It seems to me that we can describe facts like she was swinging her arms or not swinging her arms, she was speaking to the teachers or not speaking to the teachers, but I don't see how we have a fact- The testimony- That says someone is acting appropriately or not. It was the testimony of, I believe, Appellee Simons, it could have been Appellee Riley, I can confirm, that her behavior in answering questions demonstrated appropriate awareness that she was engaging with school officials. Demonstrated appropriate awareness of what? That she was engaging with school officials. Okay, well that's a little different from she was acting appropriately, which sounds like a much more global assessment of that there was nothing about her behavior that would cause school officials to take pause. Appellee Simons did testify that it is typical for middle schoolers to be hyper and giddy and to laugh in the hallway with their friends. But didn't he also think that she was doing things that were worrisome? He testified that she was engaging appropriately. I believe he also testified that J.B., while J.B. was leaning against the wall, Appellee Riley leaned against the wall in the same way during that conversation, simply resting her back against the wall. And J.B. also, according to Appellee's, responded to questions from school officials. As to whether the girl's behavior was typical, Appellee Simons testified that he had regularly seen A.S. laugh with her peers in the hallways. Appellee Riley testified that she had never observed A.S. enough to come up with a typical characterization of her behavior. No Appellee's could offer a typical characterization of I.M. I.S., Appellee's testified, was often shy, and she was shy in this interaction. And Appellee's both testified that J.B. was often talkative and jovial, just as she was during this interaction. The testimony of- It's also clear, though, just to be clear, that these students were unsupervised for several minutes. We don't really care how many, 7 or 11 or whatever. And they were completely in another part of the building, in another hallway, where they weren't supposed to be. They were out of sight, unmonitored for that period of time. So it's certainly clear that a reasonable school official could have wondered, oh my gosh, what were they up to during this period, right? Absolutely. Why were they off there? They know where they're supposed to be. They purposely were in a place where they ought not to be, and they were doing it as a group, right? That's correct. So that's going to certainly give reasonable suspicion to the school officials to think they very well could have been doing something they're not supposed to be doing during that period, right? However, TLO requires a more particularized discussion. No, no, no, but just as far as I took it. I understand. You need to go further. But what I've just said, you would agree, is reasonable. We would agree, Your Honor. But to affirm- Does the record indicate in what container this substance was usually found? Yes, Your Honor. The record that appellees have presented of incidents around the district involves bottles of cough syrup. Do we know the size of them? I think a typical bottle of Robitussin, I would think of, Your Honor. I would guess about this big. Your hands are indicating maybe six inches or so. I think that's right, and it's simply not reasonable to believe that the small spaces and fitted clothing where appellees searched the girls could have possibly contained that type of contraband. To affirm that school officials- Why is that? It could not possibly have been concealed inside the girls' leggings, inside I.M.'s bra, inside the back of the phone case and lip balm that appellee Eggleston attempted to take apart from I.M. This veers into the danger that the Supreme Court warned us against in Minnesota v. Dickerson. Appellees were simply rummaging at will. There was also a pat-down? That's correct. Where was that in the sequence? The pat-down came after the vitals check, Your Honor, of I.S. All right. Thank you. We've kept you up past your time. Thank you very much to both sides. Very helpful arguments. We will take this case under advisement. Thank you both. We also, by the way, we did receive the motion for substitution of the parties, and we will also take that under advisement in connection with the opposition as well. Thank you, Your Honor.